(Slip Opinion)          OCTOBER TERM, 2011          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* HOME CONCRETE & SUPPLY, LLC, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 11–139.   Argued January 17, 2012—Decided April 25, 2012

Ordinarily, the Government must assess a deficiency against a tax-
payer within "3 years after the return was filed," 26 U. S. C. §6501(a),
but that period is extended to 6 years when a taxpayer "omits from
gross income an amount properly includible therein which is in ex-
cess of 25 percent of the amount of gross income stated in the return,"
§6501(e)(1)(A).  Respondent taxpayers overstated the basis of certain
property that they had sold.  As a result, their returns understated
the gross income they received from the sale by an amount in excess
of 25%.  The Commissioner asserted the deficiency outside the 3-year
limitations period but within the 6-year period.  The Fourth Circuit
concluded that the taxpayers' overstatements of basis, and resulting
understatements of gross income, did not trigger the extended limita-
tions period.

*Held:* The judgment is affirmed.

634 F. 3d 249, affirmed.

   JUSTICE BREYER delivered the opinion of the Court, except as to
Part IV–C, concluding that §6501(e)(1)(A) does not apply to an over-
statement of basis.  Pp. 2–8.

   (a) In *Colony, Inc.* v. *Commissioner*, 357 U. S. 28, the Court inter-
preted a provision of the Internal Revenue Code of 1939 containing
language materially indistinguishable from the language at issue
here, holding that taxpayer misstatements that overstate the basis in
property do not fall within the statute's scope.  The Court recognized
that such an overstatement wrongly understates a taxpayer's income,
but concluded that the phrase "omits . . . an amount" limited the
statute's scope to situations in which specific receipts are *left out* of

Syllabus

the computation of gross income. The Court also noted that while the statute's language was not "unambiguous," *id.*, at 33, the statutory history showed that Congress intended to restrict the extended limitations period to situations that did not include overstatements of basis. Finally, the Court found its conclusion "in harmony with the unambiguous language of §6501(e)(1)(A)," *id.*, at 37, the provision enacted as part of the Internal Revenue Code of 1954 and applicable here. Pp. 2–4.

(b) *Colony* determines the outcome of this case. The operative language of the 1939 provision and the provision at issue is identical. It would be difficult to give the same language here a different interpretation without overruling *Colony*, a course of action *stare decisis* counsels against. *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. 130, 139. The Government suggests that differences in other nearby parts of the 1954 Code favor a different interpretation than the one adopted in *Colony*. However, its arguments are too fragile to bear the significant weight it seeks to place upon them. Pp. 4–7.

(c) The Court also rejects the Government's argument that a recently promulgated Treasury Regulation interpreting the statute's operative language in its favor should be granted deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837. See *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 982. *Colony* has already interpreted the statute, and there is no longer any different construction that is consistent with *Colony* and available for adoption by the agency. Pp. 7–8.

BREYER, J. delivered the opinion of the Court, except as to Part IV–C. ROBERTS, C. J., and THOMAS and ALITO, JJ., joined that opinion in full, and SCALIA, J., joined except for Part IV–C. SCALIA, J., filed an opinion concurring in part and concurring in the judgment. KENNEDY, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–139

UNITED STATES, PETITIONER *v.* HOME CONCRETE
& SUPPLY, LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 25, 2012]

JUSTICE BREYER delivered the opinion of the Court,
except as to Part IV–C.

Ordinarily, the Government must assess a deficiency
against a taxpayer within "3 years after the return was
filed." 26 U. S. C. §6501(a) (2000 ed.). The 3-year period
is extended to 6 years, however, when a taxpayer "*omits
from gross income an amount properly includible therein*
which is in excess of 25 percent of the amount of gross
income stated in the return." §6501(e)(1)(A) (emphasis
added). The question before us is whether this latter
provision applies (and extends the ordinary 3-year limita-
tions period) when the taxpayer *overstates his basis* in
property that he has sold, thereby *understating the gain*
that he received from its sale. Following *Colony, Inc.* v.
*Commissioner*, 357 U. S. 28 (1958), we hold that the provi-
sion does not apply to an overstatement of basis. Hence
the 6-year period does not apply.

I

For present purposes the relevant underlying circum-
stances are not in dispute. We consequently assume that
(1) the respondent taxpayers filed their relevant tax re-

turns in April 2000; (2) the returns overstated the basis of certain property that the taxpayers had sold; (3) as a result the returns understated the gross income that the taxpayers received from the sale of the property; and (4) the understatement exceeded the statute's 25% threshold. We also take as undisputed that the Commissioner asserted the relevant deficiency within the extended 6-year limitations period, but outside the default 3-year period. Thus, unless the 6-year statute of limitations applies, the Government's efforts to assert a tax deficiency came too late. Our conclusion—that the extended limitations period does not apply—follows directly from this Court's earlier decision in *Colony.*

## II

In *Colony* this Court interpreted a provision of the Internal Revenue Code of 1939, the operative language of which is identical to the language now before us. The Commissioner there had determined

> "that the taxpayer had understated the gross profits on the sales of certain lots of land for residential purposes as a result of having overstated the 'basis' of such lots by erroneously including in their cost certain unallowable items of development expense." *Id.*, at 30.

The Commissioner's assessment came after the ordinary 3-year limitations period had run. And, it was consequently timely only if the taxpayer, in the words of the 1939 Code, had "omit[ted] from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return . . . ." 26 U. S. C. §275(c) (1940 ed.). The Code provision applicable to this case, adopted in 1954, contains materially indistinguishable language. See §6501(e)(1)(A) (2000 ed.) (same, but replacing "per centum" with "percent"). See also Appendix, *infra.*

In *Colony* this Court held that taxpayer misstatements, overstating the basis in property, do not fall within the scope of the statute. But the Court recognized the Commissioner's contrary argument for inclusion. 357 U. S., at 32. Then as now, the Code itself defined "gross income" in this context as the difference between gross revenue (often the amount the taxpayer received upon selling the property) and basis (often the amount the taxpayer paid for the property). Compare 26 U. S. C. §§22, 111 (1940 ed.) with §§61(a)(3), 1001(a) (2000 ed.). And, the Commissioner pointed out, an overstatement of basis can diminish the "amount" of the gain just as leaving the item entirely off the return might do. 357 U. S., at 32. Either way, the error wrongly understates the taxpayer's income.

But, the Court added, the Commissioner's argument did not fully account for the provision's language, in particular the word "omit." The key phrase says "*omits* . . . an amount." The word "omits" (unlike, say, "reduces" or "understates") means "'[t]o leave out or unmentioned; not to insert, include, or name.'" *Ibid.* (quoting Webster's New International Dictionary (2d ed. 1939)). Thus, taken literally, "omit" limits the statute's scope to situations in which specific receipts or accruals of income are *left out* of the computation of gross income; to inflate the basis, however, is not to "omit" a specific item, not even of profit.

While finding this latter interpretation of the language the "more plausibl[e]," the Court also noted that the language was not "unambiguous." *Colony,* 357 U. S., at 33. It then examined various congressional Reports discussing the relevant statutory language. It found in those Reports

> "persuasive indications that Congress merely had in mind failures to report particular income receipts and accruals, and did not intend the [extended] limitation to apply whenever gross income was understated . . . ." *Id.,* at 35.

This "history," the Court said, "shows . . . that the Congress intended an exception to the usual three-year statute of limitations only in the restricted type of situation already described," a situation that did not include overstatements of basis. *Id.,* at 36.

The Court wrote that Congress, in enacting the provision,

> "manifested no broader purpose than to give the Commissioner an additional two [now three] years to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage . . . [because] the return on its face provides no clue to the existence of the omitted item. . . . [W]hen, *as here* [*i.e.,* where the overstatement of basis is at issue], the understatement of a tax arises from an error in reporting an item disclosed on the face of the return the Commissioner is at no such disadvantage . . . whether the error be one affecting 'gross income' or one, such as overstated deductions, affecting other parts of the return." *Ibid.* (emphasis added).

Finally, the Court noted that Congress had recently enacted the Internal Revenue Code of 1954. And the Court observed that "the conclusion we reach is in harmony with the unambiguous language of §6501(e)(1)(A)," *id.,* at 37, *i.e.,* the provision relevant in this present case.

## III

In our view, *Colony* determines the outcome in this case. The provision before us is a 1954 reenactment of the 1939 provision that *Colony* interpreted. The operative language is identical. It would be difficult, perhaps impossible, to give the same language here a different interpretation without effectively overruling *Colony,* a course of action that basic principles of *stare decisis* wisely counsel us not

to take. *John R. Sand & Gravel Co.* v. *United States*, 552 U. S. 130, 139 (2008) ("*[S]tare decisis* in respect to statutory interpretation has special force, for Congress remains free to alter what we have done" (internal quotation marks omitted)); *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989).

The Government, in an effort to convince us to interpret the operative language before us differently, points to differences in other nearby parts of the 1954 Code. It suggests that these differences counsel in favor of a different interpretation than the one adopted in *Colony*. For example, the Government points to a new provision, §6501(e)(1)(A)(i), which says:

> "In the case of a trade or business, the term 'gross income' means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to the diminution by the cost of such sales or services."

If the section's basic phrase "omi[ssion] from gross income" does not apply to overstatements of basis (which is what *Colony* held), then what need would there be for clause (i), which leads to the same result in a specific subset of cases?

And why, the Government adds, does a later paragraph, referring to gifts and estates, speak of a taxpayer who "omits . . . *items* includible in [the] gross estate"? See §6501(e)(2) (emphasis added). By speaking of "items" there does it not imply that omission of an "amount" covers more than omission of individual items—indeed that it includes overstatements of basis, which, after all, diminish the *amount* of the profit that should have been reported as gross income?

In our view, these points are too fragile to bear the significant argumentative weight the Government seeks to place upon them. For example, at least one plausible

reason why Congress might have added clause (i) has nothing to do with any desire to change the meaning of the general rule. Rather when Congress wrote the 1954 Code (prior to *Colony*), it did not yet know how the Court would interpret the provision's operative language. At least one lower court had decided that the provision did *not* apply to overstatements about the cost of goods that a business later sold. See *Uptegrove Lumber Co.* v. *Commissioner*, 204 F. 2d 570 (CA3 1953). But see *Reis* v. *Commissioner*, 142 F. 2d 900, 902–903 (CA6 1944). And Congress could well have wanted to ensure that, come what may in the Supreme Court, *Uptegrove*'s interpretation would remain the law where a "trade or business" was at issue.

Nor does our interpretation leave clause (i) without work to do. *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) (noting canon that statutes should be read to avoid making any provision "superfluous, void, or insignificant" (internal quotation marks omitted)). That provision also explains how to calculate the denominator for purposes of determining whether a conceded omission amounts to 25% of "gross income." For example, it tells us that a merchant who fails to include $10,000 of revenue from sold goods has not met the 25% test if total revenue is more than $40,000, regardless of the cost paid by the merchant to acquire those goods. But without clause (i), the general statutory definition of "gross income" requires subtracting the cost from the sales price. See 26 U. S. C. §§61(a)(3), 1012. Under such a definition of "gross income," the calculation would take (1) *total revenue from sales,* $40,000, minus (2) "*the cost of such sales,*" say, $25,000. The $10,000 of revenue would thus amount to 67% of the "gross income" of $15,000. And the clause does this work in respect to omissions from gross income irrespective of our interpretation regarding overstatements of basis.

The Government's argument about subsection (e)(2)'s use of the word "item" instead of "amount" is yet weaker.

The Court in *Colony* addressed a similar argument about the word "amount." It wrote:

> "The Commissioner states that the draftsman's use of the word 'amount' (instead of, for example, 'item') suggests a concentration on the quantitative aspect of the error—that is whether or not gross income was understated by as much as 25%." 357 U. S., at 32.

But the Court, while recognizing the Commissioner's logic, rejected the argument (and the significance of the word "amount") as insufficient to prove the Commissioner's conclusion. And the addition of the word "item" in a different subsection similarly fails to exert an interpretive force sufficiently strong to affect our conclusion. The word's appearance in subsection (e)(2), we concede, is new. But to rely in the case before us on this solitary word change in a different subsection is like hoping that a new batboy will change the outcome of the World Series.

## IV
### A

Finally, the Government points to Treasury Regulation §301.6501(e)–1, which was promulgated in final form in December 2010. See 26 CFR §301.6501(e)–1 (2011). The regulation, as relevant here, departs from *Colony* and interprets the operative language of the statute in the Government's favor. The regulation says that "an understated amount of gross income resulting from an overstatement of unrecovered cost or other basis constitutes an omission from gross income." §301.6501(e)–1(a)(1)(iii). In the Government's view this new regulation in effect overturns *Colony*'s interpretation of this statute.

The Government points out that the Treasury Regulation constitutes "an agency's construction of a statute which it administers." *Chevron, U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984).

See also *Mayo Foundation for Medical Ed. and Research* v. *United States*, 562 U. S. ___ (2011) (applying *Chevron* in the tax context). The Court has written that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the *unambiguous* terms of the statute . . . ." *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 982 (2005) (emphasis added). And, as the Government notes, in *Colony* itself the Court wrote that "it cannot be said that the language is unambiguous." 357 U. S., at 33. Hence, the Government concludes, *Colony* cannot govern the outcome in this case. The question, rather, is whether the agency's construction is a "permissible construction of the statute." *Chevron*, *supra*, at 843. And, since the Government argues that the regulation embodies a reasonable, hence permissible, construction of the statute, the Government believes it must win.

B

We do not accept this argument. In our view, *Colony* has already interpreted the statute, and there is no longer any different construction that is consistent with *Colony* and available for adoption by the agency.

C

The fatal flaw in the Government's contrary argument is that it overlooks the *reason why Brand X* held that a "prior judicial construction," unless reflecting an "unambiguous" statute, does not trump a different agency construction of that statute. 545 U. S., at 982. The Court reveals that reason when it points out that "it is for agencies, not courts, to fill statutory gaps." *Ibid.* The fact that a statute is unambiguous means that there is "no gap for the agency to fill" and thus "no room for agency discre-

tion." *Id.,* at 982–983.

In so stating, the Court sought to encapsulate what earlier opinions, including *Chevron,* made clear. Those opinions identify the underlying interpretive problem as that of deciding whether, or when, a particular statute in effect delegates to an agency the power to fill a gap, thereby implicitly taking from a court the power to void a reasonable gap-filling interpretation. Thus, in *Chevron* the Court said that, when

> "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. . . . Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. [But in either instance], a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." 467 U. S., at 843–844.

See also *United States* v. *Mead Corp.*, 533 U. S. 218, 229 (2001); *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 741 (1996); *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 448 (1987); *Morton* v. *Ruiz*, 415 U. S. 199, 231 (1974).

*Chevron* and later cases find in unambiguous language a clear sign that Congress did *not* delegate gap-filling authority to an agency; and they find in ambiguous language at least a presumptive indication that Congress did delegate that gap-filling authority. Thus, in *Chevron* the Court wrote that a statute's silence or ambiguity as to a particular issue means that Congress has not "directly addressed the precise question at issue" (thus likely delegating gap-filling power to the agency). 467 U. S., at 843. In *Mead* the Court, describing *Chevron,* explained:

> "Congress . . . may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be

apparent from the agency's generally conferred au-
thority and other statutory circumstances that Con-
gress would expect the agency to be able to speak with
the force of law when it addresses ambiguity in the
statute or fills a space in the enacted law, even one
about which Congress did not actually have an intent
as to a particular result."   533 U. S., at 229 (internal
quotation marks omitted).

*Chevron* added that "[i]f a court, *employing traditional
tools of statutory construction,* ascertains that Congress
had an intention on the precise question at issue, that
intention is the law and must be given effect."   467 U. S.,
at 843, n. 9 (emphasis added).

As the Government points out, the Court in *Colony*
stated that the statutory language at issue is not "unam-
biguous."   357 U. S., at 33.   But the Court decided that
case nearly 30 years before it decided *Chevron.*   There is
no reason to believe that the linguistic ambiguity noted by
*Colony* reflects a post-*Chevron* conclusion that Congress
had delegated gap-filling power to the agency.   At the
same time, there is every reason to believe that the Court
thought that Congress had "directly spoken to the ques-
tion at hand," and thus left "[no] gap for the agency to fill."
*Chevron*, *supra,* at 842–843.

For one thing, the Court said that the taxpayer had the
better side of the textual argument.   *Colony*, 357 U. S., at
33.   For another, its examination of legislative history led
it to believe that Congress had decided the question defini-
tively, leaving no room for the agency to reach a contrary
result.   It found in that history "persuasive indications"
that Congress intended overstatements of basis to fall
outside the statute's scope, and it said that it was satisfied
that Congress "intended an exception . . . only in the re-
stricted type of situation" it had already described.   *Id.,* at
35–36.   Further, it thought that the Commissioner's inter-

pretation (the interpretation once again advanced here) would "create a patent incongruity in the tax law." *Id.,* at 36–37. And it reached this conclusion despite the fact that, in the years leading up to *Colony*, the Commissioner had consistently advocated the opposite in the circuit courts. See, *e.g., Uptegrove*, 204 F. 2d 570; *Reis*, 142 F. 2d 900; *Goodenow* v. *Commisioner*, 238 F. 2d 20 (CA8 1956); *American Liberty Oil Co.* v. *Commissioner*, 1 T. C. 386 (1942). Cf. *Slaff* v. *Commisioner*, 220 F. 2d 65 (CA9 1955); *Davis* v. *Hightower*, 230 F. 2d 549 (CA5 1956). Thus, the Court was aware it was rejecting the expert opinion of the Commissioner of Internal Revenue. And finally, after completing its analysis, *Colony* found its interpretation of the 1939 Code "in harmony with the [now] unambiguous language" of the 1954 Code, which at a minimum suggests that the Court saw nothing in the 1954 Code as inconsistent with its conclusion. 357 U. S., at 37.

It may be that judges today would use other methods to determine whether Congress left a gap to fill. But that is beside the point. The question is whether the Court in *Colony* concluded that the statute left such a gap. And, in our view, the opinion (written by Justice Harlan for the Court) makes clear that it did not.

Given principles of *stare decisis,* we must follow that interpretation. And there being no gap to fill, the Government's gap-filling regulation cannot change *Colony*'s interpretation of the statute. We agree with the taxpayer that overstatements of basis, and the resulting understatement of gross income, do not trigger the extended limitations period of §6501(e)(1)(A). The Court of Appeals reached the same conclusion. See 634 F. 3d 249 (CA4 2011). And its judgment is affirmed.

*It is so ordered.*

APPENDIX

We reproduce the applicable sections of the two relevant versions of the U. S. Code below.  Section 6501 was amended and reorganized in 2010.  See Hiring Incentives to Restore Employment Act, §513, 124 Stat. 111.  But the parties agree that the amendments do not affect this case. We therefore have referred to, and reproduce here, the section as it appears in the 2000 edition of the U. S. Code.

Title 26 U. S. C. §275 (1940 ed.)

"**Period of limitation upon assessment and collection.**

.          .          .          .          .

"**(a) General rule.**

"The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

.          .          .          .          .

"**(c) Omission from gross income.**

"If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed."

Title 26 U. S. C. §6501 (2000 ed.)

"**Limitations on assessment and collection.**

"**(a) General rule**

"Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed

Appendix to opinion of the Court

within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. . . .

.          .          .          .          .

**"(e) Substantial omission of items**
     "Except as otherwise provided in subsection (c)—
   **"(1) Income taxes**
     "In the case of any tax imposed by subtitle A—
   **"(A) General rule**
     "If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—
       "(i) In the case of a trade or business, the term 'gross income' means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and
       "(ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

.          .          .          .          .

**"(2) Estate and gift taxes**

"In the case of a return of estate tax under chapter 11 or a return of gift tax under chapter 12, if the taxpayer omits from the gross estate or from the total amount of the gifts made during the period for which the return was filed items includible in such gross estate or such total gifts, as the case may be, as exceed in amount 25 percent of the gross estate stated in the return or the total amount of gifts stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. . . ."

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–139

_____

## UNITED STATES, PETITIONER *v.* HOME CONCRETE & SUPPLY, LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[April 25, 2012]

JUSTICE SCALIA, concurring in part and concurring in the judgment.

It would be reasonable, I think, to deny all precedential effect to *Colony, Inc.* v. *Commissioner*, 357 U. S. 28 (1958)—to overrule its holding as obviously contrary to our later law that agency resolutions of ambiguities are to be accorded deference. Because of justifiable taxpayer reliance I would not take that course—and neither does the Court's opinion, which says that "*Colony* determines the outcome in this case." *Ante*, at 4. That should be the end of the matter.

The plurality, however, goes on to address the Government's argument that Treasury Regulation §301.6501(e)–1 effectively overturned *Colony*. See 26 CFR §301.6501(e)–1 (2011). In my view, that cannot be: "Once a court has decided upon its *de novo* construction of the statute, there no longer is a different construction that is consistent with the court's holding and available for adoption by the agency." *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 1018, n. 12 (2005) (SCALIA, J., dissenting) (citation and internal quotation marks omitted). That view, of course, did not carry the day in *Brand X*, and the Government quite reasonably relies on the *Brand X* majority's innovative pronouncement that a "court's prior judicial construction of a statute

trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute." *Id.*, at 982.

In cases decided pre-*Brand X*, the Court had no inkling that it *must* utter the magic words "ambiguous" or "unambiguous" in order to (poof!) expand or abridge executive power, and (poof!) enable or disable administrative contradiction of the Supreme Court. Indeed, the Court was unaware of even the utility (much less the necessity) of making the ambiguous/nonambiguous determination in cases decided pre-*Chevron*, before that opinion made the so-called "Step 1" determination of ambiguity *vel non* a customary (though hardly mandatory[1]) part of judicial-review analysis. For many of those earlier cases, therefore, it will be incredibly difficult to determine whether the decision purported to be giving meaning to an ambiguous, or rather an unambiguous, statute.

Thus, one would have thought that the *Brand X* majority would breathe a sigh of relief in the present case, involving a pre-*Chevron* opinion that (*mirabile dictu*) makes it *inescapably clear* that the Court thought the statute ambiguous: "It *cannot* be said that the language is *unambiguous*." *Colony*, *supra*, at 33 (emphasis added). As today's plurality opinion explains, *Colony* "said that the taxpayer had the *better* side of the textual argument," *ante*, at 10 (emphasis added)—not what *Brand X* requires

———————

[1] "Step 1" has never been an essential part of *Chevron* analysis. Whether a particular statute is ambiguous makes no difference if the interpretation adopted by the agency is clearly reasonable—and it would be a waste of time to conduct that inquiry. See *Entergy Corp.* v. *Riverkeeper, Inc.*, 556 U. S. 208, 218, and n. 4 (2009). The same would be true if the agency interpretation is clearly beyond the scope of any conceivable ambiguity. It does not matter whether the word "yellow" is ambiguous when the agency has interpreted it to mean "purple." See Stephenson & Vermeule, *Chevron* Has Only One Step, 95 Va. L. Rev. 597, 599 (2009).

to foreclose administrative revision of our decisions: "the *only permissible* reading of the statute." 545 U. S., at 984. Thus, having decided to stand by *Colony* and to stand by *Brand X* as well, the plurality should have found—in order to reach the decision it did—that the Treasury Department's current interpretation was unreasonable.

Instead of doing what *Brand X* would require, however, the plurality manages to sustain the justifiable reliance of taxpayers by revising *yet again* the meaning of *Chevron*— and revising it *yet again* in a direction that will create confusion and uncertainty. See *United States* v. *Mead Corp.*, 533 U. S. 218, 245–246 (2001) (SCALIA, J., dissenting); Bressman, How *Mead* Has Muddled Judicial Review of Agency Action, 58 Vand. L. Rev. 1443, 1457–1475 (2005). Of course there is no doubt that, with regard to the Internal Revenue Code, the Treasury Department satisfies the *Mead* requirement of some indication "that Congress delegated authority to the agency generally to make rules carrying the force of law." 533 U. S., at 226– 227. We have given *Chevron* deference to a Treasury Regulation before. See *Mayo Foundation for Medical Ed. and Research* v. *United States*, 562 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 11–12). But in order to evade *Brand X* and yet reaffirm *Colony*, the plurality would add yet another lop-sided story to the ugly and improbable structure that our law of administrative review has become: To trigger the *Brand X* power of an authorized "gap-filling" agency to give content to an ambiguous text, a pre-*Chevron* determination that language is ambiguous does not alone suffice; the pre-*Chevron* Court must in addition have found that Congress wanted *the particular ambiguity in question* to be resolved by the agency. And here, today's plurality opinion finds, "[t]here is no reason to believe that the linguistic ambiguity noted by *Colony* reflects a post-*Chevron* conclusion that Congress had delegated gap-filling power to the agency." *Ante,* at 10. The notion,

seemingly, is that post-*Chevron* a finding of ambiguity is accompanied by a finding of agency authority to resolve the ambiguity, but pre-*Chevron* that was not so. The premise is false. Post-*Chevron* cases do not "conclude" that Congress wanted the particular ambiguity resolved by the agency; that is simply the *legal effect* of ambiguity—a legal effect that should obtain whenever the language is in fact (as *Colony* found) ambiguous.

Does the plurality feel that it ought not give effect to *Colony*'s determination of ambiguity because the Court did not know, in that era, the importance of that determination—that it would empower the agency to (in effect) revise the Court's determination of statutory meaning? But as I suggested earlier, that was an ignorance which all of our cases shared not just pre-*Chevron*, but pre-*Brand X*. Before then it did not really matter whether the Court was resolving an ambiguity or setting forth the statute's clear meaning. The opinion might (or might not) advert to that point in the course of its analysis, but either way the Court's interpretation of the statute would be the law. So it is no small number of still-authoritative cases that today's plurality opinion would exile to the Land of Uncertainty.

Perhaps sensing the fragility of its new approach, the plurality opinion then pivots (as the *à la mode* vernacular has it)—from focusing on whether *Colony* concluded that there was gap-filling authority to focusing on whether *Colony* concluded that there was any gap to be filled: "The question is whether the Court in *Colony* concluded that the statute left such a gap. And, in our view, the opinion . . . makes clear that it did not." *Ante,* at 11. How does the plurality know this? Because Justice Harlan's opinion "said that the taxpayer had the better side of the textual argument"; because it found that legislative history indicated "that Congress intended overstatements of basis to fall outside the statute's scope"; because it concluded that

the Commissioner's interpretation would "create a patent incongruity in the tax law"; and because it found its interpretation "in harmony with the [now] unambiguous language" of the 1954 Code. *Ante,* at 10–11 (internal quotation marks omitted). But these are the sorts of arguments that courts *always* use in *resolving* ambiguities. They do not prove that no ambiguity existed, unless one believes that an ambiguity resolved is an ambiguity that never existed in the first place. *Colony* said unambiguously that the text was ambiguous, and that should be an end of the matter—unless one wants simply to deny *stare decisis* effect to *Colony* as a pre-*Chevron* decision.

Rather than making our judicial-review jurisprudence curiouser and curiouser, the Court should abandon the opinion that produces these contortions, *Brand X.* I join the judgment announced by the Court because it is indisputable that *Colony* resolved the construction of the statutory language at issue here, and that construction must therefore control. And I join the Court's opinion except for Part IV–C.

\*    \*    \*

I must add a word about the peroration of the dissent, which asserts that "[o]ur legal system presumes there will be continuing dialogue among the three branches of Government on questions of statutory interpretation and application," and that the "constructive discourse," "'conversations[ations],'" and "instructive exchanges" would be "foreclosed by an insistence on adhering to earlier interpretations of a statute even in light of new, relevant statutory amendments." *Post*, at 7–8 (opinion of KENNEDY, J.). This passage is reminiscent of Professor K. C. Davis's vision that administrative procedure is developed by "a partnership between legislators and judges," who "working [as] partners produce better law than legislators alone could

possibly produce."[2]    That romantic, judge-empowering image was obliterated by this Court in *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519 (1978), which held that Congress prescribes and we obey, with no discretion to add to the administrative procedures that Congress has created.  It seems to me that the dissent's vision of a troika partnership (legislative-executive-judicial) is a similar mirage. The discourse, conversation, and exchange that the dissent perceives is peculiarly one-sided.  Congress prescribes; and where Congress's prescription is ambiguous the Executive can (within the scope of the ambiguity) clarify that prescription; and if the product is constitutional the courts obey.  I hardly think it amounts to a "discourse" that Congress or (as this Court would allow in its *Brand X* decision) the Executive can change its prescription so as to render our prior holding irrelevant. What is needed for the system to work is that Congress, the Executive, and the private parties subject to their dispositions, be able to predict the meaning that the courts will give to their instructions.  That goal would be obstructed if the judicially established meaning of a technical legal term used in a very specific context could be overturned on the basis of statutory indications as feeble as those asserted here.

---

[2] 1 K. Davis, Administrative Law Treatise §2.17, p. 138 (1978).

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–139

_____

## UNITED STATES, PETITIONER *v.* HOME CONCRETE & SUPPLY, LLC, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[April 25, 2012]

JUSTICE KENNEDY, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

This case involves a provision of the Internal Revenue Code establishing an extended statute of limitations for tax assessment in cases where substantial income has been omitted from a tax return. See 26 U. S. C. §6501(e)(1)(A) (2006 ed., Supp. IV). The Treasury Department has determined that taxpayers omit income under this section not only when they fail to report a sale of property but also when they overstate their basis in the property sold. See Treas. Reg. §301.6501(e)–1, 26 CFR §301.6501(e)–1 (2011). The question is whether this otherwise reasonable interpretation is foreclosed by the Court's contrary reading of an earlier version of the statute in *Colony, Inc.* v. *Commissioner*, 357 U. S. 28 (1958).

In *Colony* there was no need to decide whether the meaning of the provision changed when Congress reenacted it as part of the 1954 revision of the Tax Code. Although the main text of the statute remained the same, Congress added new provisions leading to the permissible conclusion that it would have a different meaning going forward. The *Colony* decision reserved judgment on this issue. In my view, the amended statute leaves room for the Department's reading. A summary of the reasons for

concluding the Department's interpretation is permissible, and for this respectful dissent, now follows.

I

The statute at issue in *Colony*, 26 U. S. C. §275(c) (1940 ed.), was enacted as part of the Internal Revenue Code of 1939. It provided for a longer period of limitations if the Government assessed income taxes against a taxpayer who had "omit[ted] from gross income an amount . . . in excess of 25 per centum of the amount of gross income stated in the return."

There was disagreement in the courts about the meaning of this provision in the statute as first enacted. The Tax Court of the United States, and the United States Court of Appeals for the Sixth Circuit, held that an overstatement of basis constituted an omission from gross income and could trigger the extended limitations period. See, *e.g., Reis* v. *Commissioner*, 142 F. 2d 900, 902–903 (1944); *American Liberty Oil Co.* v. *Commissioner*, 1 T. C. 386 (1942). The United States Court of Appeals for the Third Circuit came to the opposite conclusion in a case where a corporation misreported its income after inflating the cost of goods it sold from inventory. See *Uptegrove Lumber Co.* v. *Commissioner*, 204 F. 2d 570, 571–573 (1953). In the Third Circuit's view there could be an omission only where the taxpayer had left an entire "item of gain out of his computation of gross income." *Id.*, at 571. In the *Colony* decision, issued in 1958, this Court resolved that dispute against the Government. Acknowledging that "it cannot be said that the language is unambiguous," 357 U. S., at 33, and relying in large part on the legislative history of the 1939 Code, the Court concluded that the mere overstatement of basis did not constitute an omission from gross income under §275(c).

If the Government is to prevail in the instant case the regulation in question must be a proper implementation of

the same language the Court considered in *Colony;* but the statutory interpretation issue here cannot be resolved, and the *Colony* decision cannot be deemed controlling, without first considering the inferences that should be drawn from added statutory text. The additional language was not part of the statute that governed the taxpayer's liability in *Colony*, and the Court did not consider it in that case. Congress revised the Internal Revenue Code in 1954, several years before *Colony* was decided but after the tax years in question in that case. Although the interpretation adopted by the Court in *Colony* can be a proper beginning point for the interpretation of the revised statute, it ought not to be the end.

The central language of the new provision remained the same as the old, with the longer period of limitations still applicable where a taxpayer had "omit[ted] from gross income an amount . . . in excess of 25 per[cent] of the amount of gross income stated in the return." In *Colony*, however, the Court left open whether Congress had nonetheless "manifested an intention to clarify or to change the 1939 Code." *Id.*, at 37. The 1954 revisions, of course, could not provide a direct response to *Colony*, which had not yet been decided. But there were indications that, whatever the earlier version of the statute had meant, Congress expected that the overstatement of basis would be considered an omission from gross income as a general rule going forward.

For example, the new law created a special exception for businesses by defining their gross income to be "the total of the amounts received or accrued from the sale of goods or services" without factoring in "the cost of such sales or services." 26 U. S. C. §6501(e)(1)(A)(i) (1958 ed.) (currently §6501(e)(1)(B)(i) (2006 ed., Supp. IV)). The principal purpose of this provision, perhaps motivated by the facts in the Third Circuit's *Uptegrove* decision, seems to have been to ensure that the extended statute of limitations

would not be activated by a business's overstatement of the cost of goods sold. This did important work. There are, after all, unique complexities involved in calculating inventory costs. See, *e.g.,* O. Whittington & K. Pany, Principles of Auditing and Other Assurance Services 488 (15th ed. 2006) ("The audit of inventories presents the auditors with significant risk because: (*a*) they often represent a very substantial portion of current assets, (*b*) numerous valuation methods are used for inventories, (*c*) the valuation of inventories directly affects cost of goods sold, and (*d*) the determination of inventory quality, condition, and value is inherently complex"); see also Internal Revenue Service, Publication 538, Accounting Periods and Methods 17 (rev. Mar. 2008) (discussing methods for identifying the cost of items in inventory). Congress sought fit to make clear that errors in these kinds of calculations would not extend the limitations period.

*Colony* itself might be classified as a special "business inventory" case. Unlike the taxpayers here, the taxpayer in *Colony* claimed to be a business with income from the sale of goods, though the "goods" it held for sale were real estate lots. See *Intermountain Ins. Serv. of Vail* v. *Commissioner*, 650 F. 3d 691, 703 (CADC 2011) (Tatel, J.) ("Colony described itself as a taxpayer in a trade or business with income from the sale of goods or services—i.e., as falling within [clause] (i)'s scope had the subsection applied pre-1954 . . ."). The Court, in turn, observed that its construction of the pre-1954 statute in favor of the taxpayer was "in harmony with the unambiguous language of [newly enacted] §6501(e)(1)(A)." 357 U. S., at 37. Clause (i) of the new provision, as just noted, ensured that the extended limitations period would not cover overstated costs of goods sold. The revised statute's special treatment of these costs suggests that overstatements of basis in other cases could have the effect of extending the limitations period.

It is also significant that, after 1954, the statute continued to address the omission of a substantial "amount" that should have been included in gross income. In the same round of revisions to the Tax Code, Congress established an extended limitations period in certain cases where "items" had been omitted from an estate or gift tax return. 26 U. S. C. §6501(e)(2) (1958 ed.). There is at least some evidence that this term was used at that time to "mak[e] it clear" that the extended limitations period would not apply "merely because of differences between the taxpayer and the Government as to the valuation of property." Staff of the Joint Committee on Internal Revenue Taxation, Summary of the New Provisions of the Internal Revenue Code of 1954, 84th Cong., 1st Sess., 130 (Comm. Print 1955). Congress's decision not to use the term "items" to achieve the same result when it reenacted the statutory provision at issue is presumed to have been purposeful. See *Russello* v. *United States*, 464 U. S. 16, 23 (1983). This consideration casts further doubt on the premise that the new version of the statute, §6501(e)(1)(A) (2006 ed., Supp. IV), necessarily has the same meaning as its predecessor.

## II

In the instant case the Court concludes these statutory changes are "too fragile to bear the significant argumentative weight the Government seeks to place upon them." *Ante,* at 5. But in this context, the changes are meaningful. *Colony* made clear that the text of the earlier version of the statute could not be described as unambiguous, although it ultimately concluded that an overstatement of basis was not an omission from gross income. See 357 U. S., at 33. The statutory revisions, which were not considered in *Colony*, may not compel the opposite conclusion under the new statute; but they strongly favor it. As a result, there was room for the Treasury Department to

interpret the new provision in that manner.  See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–845 (1984).

In an earlier case, and in an unrelated controversy not implicating the Internal Revenue Code, the Court held that a judicial construction of an ambiguous statute did not foreclose an agency's later, inconsistent interpretation of the same provision.  *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 982–983 (2005) ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction").  This general rule recognizes that filling gaps left by ambiguities in a statute "involves difficult policy choices that agencies are better equipped to make than courts." *Id.,* at 980.  There has been no opportunity to decide whether the analysis would be any different if an agency sought to interpret an ambiguous statute in a way that was inconsistent with this Court's own, earlier reading of the law.  See *id.,* at 1003 (Stevens, J., concurring).

These issues are not implicated here.  In *Colony* the Court did interpret the same phrase that must be interpreted in this case.  The language was in a predecessor statute, however, and Congress has added new language that, in my view, controls the analysis and should instruct the Court to reach a different outcome today.  The Treasury Department's regulations were promulgated in light of these statutory revisions, which were not at issue in *Colony*.  There is a serious difficulty to insisting, as the Court does today, that an ambiguous provision must continue to be read the same way even after it has been reenacted with additional language suggesting Congress would permit a different interpretation.  Agencies with the responsibility and expertise necessary to administer ongoing regulatory schemes should have the latitude and discre-

tion to implement their interpretation of provisions reenacted in a new statutory framework. And this is especially so when the new language enacted by Congress seems to favor the very interpretation at issue. The approach taken by the Court instead forecloses later interpretations of a law that has changed in relevant ways. Cf. *United States* v. *Mead Corp.*, 533 U. S. 218, 247 (2001) (SCALIA, J., dissenting) ("Worst of all, the majority's approach will lead to the ossification of large portions of our statutory law. Where *Chevron* applies, statutory ambiguities remain ambiguities subject to the agency's ongoing clarification"). The Court goes too far, in my respectful view, in constricting Congress's ability to leave agencies in charge of filling statutory gaps.

Our legal system presumes there will be continuing dialogue among the three branches of Government on questions of statutory interpretation and application. See *Blakely* v. *Washington*, 542 U. S. 296, 326 (2004) (KENNEDY, J., dissenting) ("Constant, constructive discourse between our courts and our legislatures is an integral and admirable part of the constitutional design"); *Mistretta* v. *United States*, 488 U. S. 361, 408 (1989) ("Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest"). In some cases Congress will set out a general principle, to be administered in more detail by an agency in the exercise of its discretion. The agency may be in a proper position to evaluate the best means of implementing the statute in its practical application. Where the agency exceeds its authority, of course, courts must invalidate the regulation. And agency interpretations that lead to unjust or unfair consequences can be corrected, much like disfavored judicial interpretations, by congressional action. These instructive exchanges would be foreclosed by an insistence on adhering to earlier interpretations of a statute even in light of new,

relevant statutory amendments. Courts instead should be open to an agency's adoption of a different interpretation where, as here, Congress has given new instruction by an amended statute.

Under the circumstances, the Treasury Department had authority to adopt its reasonable interpretation of the new tax provision at issue. See *Mayo Foundation for Medical Ed. and Research* v. *United States*, 562 U. S. __, __ (2011) (slip op., at 10). This was also the conclusion reached in well-reasoned opinions issued in several cases before the Courts of Appeals. *E.g., Intermountain*, 650 F. 3d, at 705–706 (reaching this conclusion "because the Court in *Colony* never purported to interpret [the new provision]; because [the new provision]'s 'omits from gross income' text is at least ambiguous, if not best read to include overstatements of basis; and because neither the section's structure nor its [history and context] removes this ambiguity").

The Department's clarification of an ambiguous statute, applicable to these taxpayers, did not upset legitimate settled expectations. Given the statutory changes described above, taxpayers had reason to question whether *Colony*'s holding extended to the revised §6501(e)(1). See, *e.g., CC & F Western Operations L. P.* v. *Commissioner*, 273 F. 3d 402, 406, n. 2 (CA1 2001) ("Whether *Colony*'s main holding carries over to section 6501(e)(1) is at least doubtful"). Having worked no change in the law, and instead having interpreted a statutory provision without an established meaning, the Department's regulation does not have an impermissible retroactive effect. Cf. *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 741, 744, n. 3 (1996) (rejecting retroactivity argument); *Manhattan Gen. Equipment Co.* v. *Commissioner*, 297 U. S. 129, 135 (1936) (same). It controls in this case.

\*    \*    \*

For these reasons, and with respect, I dissent.